*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0140P (6th Cir.)
File Name: 04a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOHN G. SPIRKO, JR.,
    *Petitioner-Appellant,*

    *v.*

    No. 00-4385

BETTY MITCHELL, Warden,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 95-07209—James G. Carr, District Judge.

Argued: April 30, 2002

Decided and Filed: May 17, 2004

Before: BATCHELDER, DAUGHTREY, and GILMAN,
Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Thomas C. Hill, SHAW PITTMAN, Washington, D.C., for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Thomas C. Hill, SHAW PITTMAN, Washington, D.C., John J. Callahan, McHUGH, DeNUNE & McCARTHY, Sylvania, Ohio, for Appellant.

Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

BATCHELDER, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. GILMAN, J. (pp. 21-28), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

ALICE M. BATCHELDER, Circuit Judge. John G. Spirko appeals the order of the district court denying his petition for a writ of habeas corpus. An Ohio jury found Spirko guilty of aggravated murder with specifications and recommended that he be sentenced to death. The state trial court accepted that recommendation and sentenced Spirko to death on September 24, 1984. Spirko's motion for a new trial was denied, and his direct appeals of his conviction and sentence, his petition for a writ of certiorari in the United States Supreme Court and his petitions for post-conviction relief were unsuccessful. On March 31, 1995, he filed a petition for habeas corpus in the district court; he filed an amended petition and a request for an evidentiary hearing on March 10, 1999, alleging fifteen separate grounds for relief, each of which the district court addressed and found to be without merit. The district court denied the petition, and Spirko timely appealed.

Before us, Spirko argues that 1) the prosecution denied Spirko due process by knowingly presenting false evidence and a false theory of the case at trial; 2) the prosecution denied Spirko due process by violating the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963); 3) Spirko's trial counsel were ineffective because they did not investigate the alibi claim of Delaney Gibson, who was indicted with Spirko for the murder; 4) the prosecution probably suborned perjury at trial; 5) the district court erred in denying Spirko's actual

innocence claim; 6) Spirko was denied due process by the prosecution's use of a suggestive photo array and hypnotically refreshed testimony, and by his trial in an improper venue; 7) the district court erred in denying Spirko's request for discovery and an evidentiary hearing; 8) Spirko was denied due process as a result of several errors during the sentencing phase of the trial. After reviewing the district court's exhaustive opinion, we conclude that we agree with its findings and its conclusions[1], and we will not separately address any of Spirko's claims except those relating to the alleged *Brady* violations. We think that the *Brady* claims, although ultimately meritless, deserve specific attention.

The only *Brady* claim that Spirko actually argues in his brief is that the state withheld from him evidence that an individual named Delaney Gibson, who was indicted with Spirko for the murder but escaped and remained a fugitive until well after Spirko had been tried and convicted, could not have been present when the murder was committed. It is useful to recount the facts relevant to this claim.

At approximately 8:30 a.m. on August 9, 1982, Betty Jane Mottinger was discovered to be missing from her post as postmistress of the Elgin, Ohio, Post Office in Van Wert County. Also missing were Mrs. Mottinger's purse and approximately $750 in cash, postage stamps and money orders. Some three weeks later, her decomposing body was

---

[1]The district court held that although Spirko filed his habeas petition prior to the effective date of the Anti-terrorism and Effective Death Penalty Act ("AEDPA" or "the Act"), the AEDPA is retroactively applicable to the petition. The district court noted that Spirko did not argue to the contrary; the court also held, in the alternative, that the outcome of the case was not affected by the retroactive application of the Act. The district court's retroactive application of AEDPA to this petition was error. We have reviewed the petition under the pre-AEDPA standard, *see Lindh v. Murphy*, 521 U.S. 320, 326 (1997), however, and conclude that the district court was correct in its conclusion that the outcome of this case is the same when the pre-AEDPA standard is applied, and therefore we hold that the error is harmless.

found in a bean field in neighboring Hancock County. The body, bearing between fourteen and eighteen stab wounds to the chest and stomach, was fully clad, wrapped in a paint-splattered curtain which appeared to have been used by painters as a drop-cloth, and tied with a cord similar to a clothesline.

The investigation into the abduction and death of Mrs. Mottinger was massive. Authorities interviewed over three thousand people and spent countless man hours seeking information to solve the crime. The prosecution followed anonymous leads, tips based on old hearsay, and any trail that might lead to probative evidence. The record is enormous and contains reports from the interviews and documents from the investigative efforts. Among the interviews documented in the record are the many interviews of the petitioner, John Spirko.

In October of 1982, Spirko initiated contact with law enforcement officers, including postal inspectors. Spirko, who was then in jail in Lucas County, Ohio, on unrelated charges, told the officers that he had information about Mrs. Mottinger's killing, and suggested that in exchange for the officers' help on those charges, he could help them in the Mottinger case. Over the next several weeks, Spirko gave a series of differing accounts of the murder. His tales included persons named "Rooster," "Dope Man," "Spooky" and "Dirty Dan." Early in his "cooperation" with the postal inspectors, he told Inspector Paul Hartman that he had been at a party where an unnamed person had told him that three white males had murdered Mrs. Mottinger after the three had gone to the post office to claim a package containing heroin, had gotten into some kind of scuffle, and had been forced to kidnap the postmistress. According to Spirko, while he was at the party, he saw a cream-colored handbag with brown trim, containing coins, some money orders and gold jewelry. He changed his story a few days later, telling Inspector Hartman at the outset of the interview, "Look Paul, I've thrown you a few curves and you have thrown me a few curves. From now on, it's

going to be straight down the line." Spirko went on to say that he himself had been commissioned by The Dope Man[2] to retrieve a package containing heroin from a man named Rooster, and claimed that Spirko and another man had driven to a house where Spirko saw Mrs. Mottinger's body. Spirko said that the body was already bound; that one of the men in the house had unwrapped it to recover a cigarette lighter; and the body had about 15 stab wounds. Spirko related further that the Dope Man decided that Rooster should be killed, and that Spirko had driven Rooster and two other persons to an undisclosed location where Rooster was shot and buried in a marsh.

A few days later, Spirko expanded his story to include a man named "Swartz," who told him that Rooster and Dirty Dan had killed Mrs. Mottinger because she had bitten Rooster when he forced her to perform oral sex on him. Spirko claimed that he and Swartz had gone to the house where the murder was committed; there he saw Rooster and Dirty Dan with blood on their clothes and a gray curtain which was torn at the end; he also saw a brown car, inside of which was a cream-colored purse with brown trim, containing money orders, change and gold jewelry.

The next day, December 9, Spirko again changed his story. This time, he said it was in fact Rooster who had told him how the murder took place, and that Rooster had said that the only thing that bothered him about the murder was the "whoosh" sound that the knife made when he stabbed Mrs. Mottinger. Although Spirko stuck to his claim that Rooster

---

[2] The Ohio Supreme Court refers to "someone named Vito" in relating this rendition of Spirko's story, which appears to us to be attributable to a court-reporting error. Throughout this part of Hartman's trial testimony he refers to "The Dope Man," but on page 13 of Hartman's testimony—which is also page 2391 of the trial transcripts—the transcript reads: "The defendant was ultimately commissioned by Vito man to recover this parcel containing the narcotics." No other reference to anyone named "Vito" appears.

himself had been killed, he now said that Rooster's body had been deposited in a swamp in Florida. And on December 10, Spirko described to Inspector Hartman the clothing that Mrs. Mottinger had been wearing when she disappeared.

Hartman next interviewed Spirko on December 13, 1982. Spirko now claimed that he and Swartz had actually been present when Mrs. Mottinger was killed. First, Spirko said that while he was watching television in the house, Rooster had chased Mrs. Mottinger outside where Rooster and Dirty Dan had stabbed her. Later in the day, Spirko told Hartman that an unknown biker, along with Rooster and a man named Dean or Dino, had taken turns raping Mrs. Mottinger, and when she tried to escape Spirko stopped her and held her down while Rooster repeatedly stabbed her in the stomach.

When interviewed on December 15, 1982, Spirko claimed that he and Dino, Dirty Dan, Rooster and the biker, had spent the night of August 8th sleeping in a roadside park. The next morning, Rooster, Dino and the biker went in to Elgin, kidnapped Mrs. Mottinger and brought her back to where Spirko and Dirty Dan were parked on a road near the farmhouse where Spirko claimed the murder took place. Faced with the necessity of doing something with the victim because she could identify them, Rooster, the biker and Dirty Dan first raped her—apparently out of the presence of Spirko and Dino—and then, outside of the house and in front of Spirko and Dino, stabbed her repeatedly. Rooster, the biker and Dan rolled the body onto a piece of curtain they had in the car, removed the jewelry from the body and pried the stone from a ring on the victim's hand, and, bringing the curtain down over the victim's head, wrapped the body end-to-end. Because Rooster had carelessly dropped his cigarette lighter into the curtain during this process, they unwrapped the body, recovered the lighter, and wrapped it up again.

Investigator Hartman testified that several aspects of this evolving tale were of particular significance: the detail about the victim's purse and its contents; the description of the

clothing the victim had been wearing; the description of the curtain in which the body was wrapped, including the detail that part of the curtain had been torn off; the description of the way in which the body had been wrapped in that curtain; and the fact of the stone's having been pried from the victim's ring. These factually accurate details were not matters that had been made public.

On January 11, 1983, Hartman interviewed Spirko again. By now, Spirko was in the federal penitentiary in Leavenworth, Kansas, having been admitted into the federal witness protection program. This time, Spirko advised Hartman that there had been no narcotics involved in the abduction and murder of Mrs. Mottinger, but that he had heard that the entire incident began as a robbery attempt. When Hartman refused to believe any of this allegedly third-hand account, Spirko admitted that it was not true, but said that he couldn't tell the truth because he had to protect "the only friend he ever had in his whole life." Spirko went on to say that this friend had been in the Elgin area immediately after the crime was committed, and that Spirko had seen the proceeds from the post office robbery.

The following day, Spirko identified his friend as Delaney Gibson; Spirko said that on August 11 or 12, 1982, he had gone drinking with Gibson and two individuals named Clyde Cravens and Eugene Sizemore, and had learned that those three had robbed the post office and murdered Mrs. Mottinger. Spirko said that Gibson had showed him the trunk of the car where they had put the body; the trunk was stained and emitted a strong odor. Gibson also showed him a duffel bag containing a collection of guns, including a chrome-plated .357 magnum with ivory handles, and a cream-colored canvas purse containing money orders and change. Spirko said that he saw a rolled-up gray curtain on the floor of the back seat of Gibson's car. He also stated that, a couple of weeks later, Gibson offered to pay Spirko to kill Clyde Cravens, whom Gibson called "Rooster," because he could identify Gibson. According to Spirko, Gibson explained that

Rooster and Sizemore had attempted to rob the post office while Gibson drove the get-away car. When the postmistress began to scream, Gibson went to the post office and helped the other two abduct Mrs. Mottinger. They then raped her and when she tried to escape, they stabbed her and dumped the body. Spirko said that Gibson explained that they stabbed the victim rather than using the guns to kill her because "where they were at, if they had shot her, it would have been their ass." Gibson said that robbing the post office had been stupid because there was no real money in it, and all they got was change; he also explained that because the money orders were traceable, they had burned them rather than cashing them.

Of particular significance to Inspector Hartman were the details about the .357 magnum (the investigation having revealed that Gibson possessed such a firearm), the cream-colored purse and its contents, the description of the gray curtain in the back seat of the car, the fact that the robbery had primarily yielded change, and the fact that the money orders had been destroyed. Also important were the names of Cravens and Sizemore, both of whom the investigators determined were real individuals; the inspectors found no evidence connecting either of them to the robbery and murder. Inspector Hartman also testified that the investigators looked into the other individuals whom Spirko had named—in his pre-Leavenworth interviews—and had determined that they were either real people who had no connection with the murder, or were people who apparently did not exist.

While he was in jail, Spirko wrote a letter to his girlfriend in which he said, "[T]here are some things that I told him [Inspector Hartman] that only the persons who did this shit know, there are no if and ands about that." Spirko was right. He had given the authorities facts about the crime that had not been disseminated by the authorities and were not generally known by the public, including the number and location of stab wounds on Mrs. Mottinger's body; a description of the

clothing Mrs. Mottinger had been wearing when she was abducted; the fact that a stone had been pried from a ring she had been wearing; a description of the type of fabric the body was wrapped in as well as a description of the way the body was wrapped; a description of her purse; and a description of the contents of the purse.

A number of persons who had been in the vicinity of the post office around the time Mrs. Mottinger was abducted were interviewed. One of them, after viewing a photo array, identified Delaney Gibson as a man she had seen getting out of a car with a "cinnamon top and a bronzish-brown bottom," in front of the post office at 8:30 that morning. In the picture, Gibson was clean-shaven. A second witness identified—with about 70% certainty—Spirko from a photo array as the man he had seen at 8:30 that morning, standing by a copper-toned late 1970s car with a lighter top.

The investigators conducted a comprehensive investigation into Delaney Gibson. They discovered that Gibson was, as Spirko claimed, a close friend and, in fact, one of Spirko's prior cellmates. After locating Gibson in North Carolina, police investigators interviewed him, eventually taking him into custody. Gibson denied any involvement in the abduction or murder claiming that he was employed as a migrant worker in North Carolina during the time period surrounding the incident. Gibson admitted to his friendship with Spirko but claimed that he had not seen Spirko for years. In August of 1983, Gibson escaped from police custody. He was indicted in September 1983, along with Spirko, for the murder of Mrs. Mottinger, recaptured, and shortly before the date scheduled for Spirko's trial, escaped again. Gibson remained a fugitive until well after Spirko's trial had been completed.

The investigators interviewed Gibson's sometime crew chief, Juan Flores, who confirmed that he employed Gibson in North Carolina as a produce picker and that Gibson was in his employ from June, 1982, until October, 1982. Flores

stated that he thought he remembered three or four days during that period when Gibson was absent from work but he could not remember when, exactly, the absences occurred.

Postal inspectors interviewed Gibson's wife, Margie, on December 21, 1983. Margie told them that sometime during the month of August, 1982, her sister and brother-in-law, Brenda and Michael Bentley, had visited the Gibsons in North Carolina, staying for a couple of days. Margie showed the inspectors pictures—allegedly taken during the visit—of the Bentleys with Margie and a bearded Delaney Gibson. The inspectors also interviewed the Bentleys, who said that they had visited the Gibsons in North Carolina on Saturday, August 7 and Sunday, August 8, 1982; had left North Carolina around 6:00 p.m. on August 8; and had driven north to Newport, Tennessee, where they had stayed in a motel the night of August 8. The Bentleys also had pictures that they said were taken during the visit. The postal inspectors were able to verify the Bentleys' overnight stay at a motel in Newport on Sunday night, August 8, 1982, as well as Brenda Bentley's statement that she had dropped off two rolls of film for processing on August 10.

On January 11, 1984, the inspectors again interviewed Margie Gibson and obtained from her the photographs that she claimed had been taken during the August, 1982, visit. The inspectors subsequently determined that Margie Gibson had taken film to be processed on August 17, 1982, and that a receipt from an automotive store in North Carolina near the Gibson's home, issued to "Jim Gibson" (one of Delaney Gibson's aliases) on August 7, 1982, was authentic.

Spirko claims that this evidence demonstrates that Gibson could not have been in Elgin, Ohio, on the morning of August 9, 1982, and that on that day Gibson was not clean shaven but wore a full beard. Spirko reasons that because the theory of the state's case against Spirko was that Gibson and Spirko had acted together in the abduction and murder of Mrs. Mottinger, evidence that Gibson was not in Ohio at the time

of the murder is evidence that also is exculpatory of Spirko. The state's failure to turn this evidence over to him, Spirko argues, violated the state's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

*Brady* established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. *Brady* does not grant broad discovery powers to the defendant, but is instead intended only to ensure that the defendant has access to impeachment evidence and evidence favorable to him, suppression of which would deprive him of a fair trial. *United States v. Bagley*, 473 U.S. 667, 675 (1985).

Essential to the determination of whether the state's failure to disclose evidence is a *Brady* violation is *Brady*'s requirement that the withheld evidence be "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court elaborated upon *Bagley*'s materiality requirement, explaining:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434. The Court went on to emphasize that materiality is not determined by looking at the sufficiency of the evidence; rather we must determine whether the favorable evidence could reasonably be viewed as putting the entire case "in such a different light as to undermine confidence in

the verdict." *Id.* at 435. The Court noted that if the suppression of evidence in fact violated *Brady*, then the error is not subject to harmless error review, since a failure to disclose evidence that could reasonably be viewed as casting the entire case in a different light could hardly be viewed as harmless error. The Court stressed that suppressed evidence is to be viewed collectively, rather than item by item, and a defendant does not establish a *Brady* violation by showing only that the prosecution was aware of but did not disclose an item of evidence favorable to the defendant. *Id.* at 436-37.

More recently, the Supreme Court reviewed the elements of a *Brady* violation, reminding us that, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict," and summarizing the components of a "true" *Brady* violation:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). In *Strickler*, the Court's focus was on the third component, "whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry." *Id.* at 282. To satisfy this requirement, the Court reiterated, the petitioner "must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Id.* at 289.

Like several of our sister circuits, this circuit has held that because *Brady* did not alter the rule that defendants have no general constitutional right to discovery in criminal cases, a prosecutor violates his constitutional duty of disclosure only if "his omission is of sufficient significance to result in the

denial of defendant's right to a fair trial," *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)), and where the defendant was "aware of the essential facts that would enable him to take advantage of the exculpatory evidence," the government's failure to disclose it did not violate *Brady*. *Id.* In *Todd*, we found no *Brady* violation where the prosecutor had disclosed to the defense the fact that two witnesses possibly possessed exculpatory evidence but did not disclose what that evidence was. *See also United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (quotations and citation omitted) (holding that there is no *Brady* violation if the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information or where the evidence is available to defendant from another source"). The Fourth Circuit has held that "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources," *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986)); and "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine. *Id.* at 381. The Second Circuit (*United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988)) and the First Circuit (*Lugo v. Munoz*, 682 F.2d 7, 9-10 (1st Cir. 1982)) have similarly ruled.

Spirko contends that the state violated the requirements of *Brady* by failing to turn over to his counsel all of the investigative reports and photographs regarding Delaney Gibson's whereabouts at the time of the abduction and murder of Mrs. Mottinger. It is undisputed that Spirko's defense counsel stipulated prior to trial that they had received from the state memoranda of interviews of Gibson done on April 21, 22 and 29, 1983; the "Interview Concerning Delaney Gibson. a) Roger Burress [the owner of one of the farms on which Gibson worked picking tomatoes during the summer of 1982] b) Margie Gibson;" a photograph of

Delaney Gibson; and "Information concerning Delaney Gibson: Mr. Michael Bentley, Box 425, Ary Kentucky 41712, has stated that Delaney Gibson was with him and his wife in North Carolina on 8/7/82 and 8/8/82 and that pictures are purported to have been taken of the weekend in question."

Spirko was thus on notice that there was evidence that Delaney Gibson had been in North Carolina on the day before the murder, and Spirko was given the identity and location of some of the witnesses to Gibson's whereabouts on that day. The state court made factual findings that Spirko's counsel had notice of this evidence; those findings are amply supported by the record and are binding on the federal habeas court under the pre-AEDPA 28 U.S.C. § 2254(d).

Spirko's complaint is essentially that he was entitled to have all of the state's evidence with regard to the North Carolina alibi turned over to him. But this is not the law. Like the defendant in *Todd*, Spirko was "aware of the essential facts that would enable him to take advantage of the exculpatory evidence." *Todd*, 920 F.2d at 405. A reasonable defendant would have pursued that inquiry—unless, of course, he already knew that the inquiry would not in fact result in exculpatory information—but Spirko did not do so. We hold, consistent with *Todd*, *Clark* and *Wilson*, that because the evidence was available to Spirko from other sources than the state, and he was aware of the essential facts necessary for him to obtain that evidence, the *Brady* rule does not apply.

We hold further that Spirko has not demonstrated that this evidence was of a kind that the state would have been required to disclose under *Brady*. Spirko cannot demonstrate that the evidence regarding Gibson's alibi—that is, the claim that Gibson was not and could not have been in Ohio on the morning of August 9, 1982—is favorable to Spirko, and he cannot demonstrate that he was prejudiced by the state's failure to disclose it.

Spirko argues that the evidence was favorable to him because, like the undisclosed evidence in *Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002), it undermined the theory of the prosecution's case. In *Jamison*, we held that evidence withheld from the defendant was favorable to him because, while it did not eliminate him as the perpetrator of the crime, it did contradict the testimony of the chief prosecution witness, undermine the prosecution's theory of how the murder was committed, impeach the testimony of key prosecution witnesses, and, in fact, point to the chief prosecution witness and another individual as potential suspects. *Id*. at 389-391. Here, however, the evidence regarding Gibson's whereabouts neither contradicts nor undermines the state's theory of the crime. While it is true that Gibson was indicted for the murder, and the state viewed him as probably having been the chief perpetrator, the state's case against Spirko was not dependent upon Gibson's being proven to be part of the crime. The state's case against Spirko was based principally on Spirko's own statements to the investigators demonstrating intimate knowledge of facts that, in Spirko's own words, "only the persons who did this shit know." Spirko knew.

The Gibson evidence does not prove that Gibson could not have been in Elgin, Ohio, on the morning that the crime was committed. More relevant to Spirko's *Brady* claim, however, is the fact that the Gibson evidence not only does not eliminate Spirko as the perpetrator, it eliminates his best defense. If Gibson was not a participant in the murder, then he was not, as Spirko told the investigators and claimed at trial, the source of all of Spirko's detailed knowledge of crime. And if Spirko did not learn the details of this crime from Gibson, from whence did all of that detail come?

Spirko cannot demonstrate that he was prejudiced by the government's failure to disclose the Gibson information. Prejudice for *Brady* purposes, the Supreme Court said in *Strickler*, is necessary to establish the "materiality" requirement. Spirko may demonstrate that prejudice only by

"convinc[ing] us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U.S. at 290. But here, even if Spirko could demonstrate that the Gibson evidence proved beyond question that Gibson could not have been part of the crime, he cannot show a reasonable probability that by presenting that evidence to the jury, he could have cast the entire case "in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435, or that, if the evidence had been disclosed to him, "the result of the trial would have been different." *Strickler*, 527 U.S. at 289. As we have already noted, if the jury had concluded that Gibson could not have been one of the perpetrators, then the jury would also have concluded that Gibson could not have been the source of Spirko's detailed knowledge of the crime. And, alternatively, Spirko has certainly not demonstrated that if he had been aware of this evidence—and thus had known that Gibson was not involved in the crime—he could have come up with a better story about how he came to know so much about the murder. This evidence was simply not material.

In the statement of facts contained in his brief on appeal, Spirko claims that the state also failed to provide him with investigative records from the massive investigation. Specifically, Spirko points to those containing information allegedly inculpating other individuals in the abduction and murder of Mrs. Mottinger, and detailing the interviews of persons who failed to place either Gibson or Spirko at the post office at the time of the abduction. His brief does not, however, contain any legal argument with regard to any of these individuals or demonstrate that any of the evidence he points to meets the *Kyles* and *Strickler* requirements of materiality.

By failing to provide the court with any developed legal argument with regard to the individuals, Spirko has waived any argument he might have. "It is a 'settled appellate rule that issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.'" *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). We have nonetheless reviewed the record with regard to these claims, and we conclude that they are entirely without merit. Looking first at the interviews of individuals who did not see either Gibson or Spirko in the vicinity of the post office on the morning of the abduction, we find that the record clearly demonstrates that these individuals did not see anyone or anything out of the ordinary. That there were people on the scene who did not notice anything out of place or any strange faces is neither favorable to Spirko nor exculpatory of him, nor would the disclosure of all of the state's information about these people have been reasonably likely to bring about a different result at trial.

We have also carefully reviewed Spirko's claims that various individuals interviewed or investigated were potential suspects such that the investigative reports should have been disclosed to him by the state. The district court concluded, and we agree, that the record does not support the readings of these reports that Spirko urges; the record does support the state's conclusions that no credible evidence supported any further investigation into any of them as potential suspects. Most importantly, nothing revealed in any of the investigative reports about these individuals in any way undermines the state's case against Spirko because nothing in these reports eliminates Spirko as a participant in the crime or provides a plausible and innocent explanation for his detailed knowledge of it. This information is neither favorable to Spirko nor material to his defense.

The one piece of information to which Spirko points that, at first blush, might give us pause, is his claim that one of the prosecution's witnesses, Debbie Young, the sister of John Willier, was intimately involved during the trial with the prosecution's chief investigator. On closer review, however, this information is no more exculpatory or impeaching than

any other that Spirko proffers as evidence that the state violated the requirements of *Brady*. Before the district court, Spirko theorized that Willier had killed Mrs. Mottinger in Willier's trailer. Spirko has provided virtually no factual basis in his brief on appeal for this theory of the crime; he has developed no legal argument in his brief for his claim that evidence of Willier's sister's relationship with the investigator would have been either exculpatory or impeaching; he provides no explanation of how Ms. Young's testimony was affected by the alleged relationship with the investigator or, indeed, the substance of that testimony, and none of Ms. Young's testimony appears in the Joint Appendix. Neither is there any evidence in the record that would support Spirko's theory that Mrs. Mottinger was killed in Willier's trailer.

A review of the record of the prior proceedings in this matter establishes that Spirko bases this entire *Brady* claim on wholly unsupported speculation. Spirko testified at trial that sometime after the time of the murder, he and Gibson had gone to a trailer in a trailer park, and that he had seen a large quantity of "thick, gooey blood in the bathtub" of the trailer. Spirko did *not* testify that the trailer belonged to or was lived in by John Willier, and the record contains no evidence whatsoever that Spirko was ever in John Willier's trailer. Only if the record established that Spirko was in John Willier's trailer around the time of the murder could we even possibly draw the inference that Spirko apparently believes we should draw, namely that Mrs. Mottinger was killed in John Willier's trailer.

We learn from reviewing the record of prior proceedings—because Spirko's brief contains neither facts nor argument with regard to this testimony—that Ms. Young testified that she had been in her brother John Willier's trailer every day for several days after the murder and saw no evidence of blood in the bathtub. Spirko's father testified to the same effect. Spirko would have us infer that Ms. Young's testimony was false, apparently because of her relationship

with the chief investigator. But only if there were evidence that Spirko was ever in John Willier's trailer would any testimony by Ms. Young that there was no blood in the bathtub in that trailer have any relevance to the charges against Spirko. The record contains no such evidence.

The district court concluded that none of this information was of sufficient probative value to create any doubt about the verdict against Spirko. While we do not entirely subscribe to the district court's conclusion that Ms. Young's relationship with the investigator would have had no impact on the jury's assessment of her credibility, we find no error in the court's overall assessment of this *Brady* claim. Spirko has wholly failed to demonstrate a reasonable probability that if the information to which he points had been disclosed to him "the result of the trial would have been different." *Strickler*, 527 U.S. at 289. This alleged *Brady* claim, like all of the others, is without merit.

Finally, we must consider whether, even if any of this evidence met the *Brady* requirements, Spirko would have been convicted on evidence unaffected by that which was not disclosed. We hold that clearly he would. As we have repeatedly pointed out, Spirko's conviction rested in large measure on his knowledge of non-public facts about the crime, all of which he volunteered to the investigators. The evidence from his own mouth was accompanied by the testimony of two of his cellmates who testified that Spirko told them about the murder and his part in it. There is no reasonable probability that anything that he now complains the state failed to disclose to him would have made any difference in the result of the trial.

To summarize, we hold that the state did not violate the requirements of *Brady* with regard to any of the evidence of which Spirko complains. The *Brady* rule does not apply to the evidence of Gibson's whereabouts the day before the murder because Spirko was on notice of the essential facts necessary to permit him to obtain it through other sources.

Even if that evidence should have been disclosed, Spirko has not demonstrated that it or any of the undisclosed evidence to which he points was favorable to him or that he was prejudiced by its nondisclosure. The *Brady* claims are without merit. The district court carefully and correctly assessed each of the other claims of error raised in this appeal, and we now **affirm** in its entirety the district court's judgment denying the petition for a writ of habeas corpus.

---

### DISSENT

---

RONALD LEE GILMAN, Circuit Judge, dissenting.

#### I. OVERVIEW

As conceded in the appellate brief of Spirko's counsel, "John Spirko lied." This incontestible conclusion is well-documented in the majority opinion's recitation of the many inconsistent stories that Spirko told to Inspector Hartman. But lying is not a capital offense. And while the record leaves no doubt about Spirko's falsifications, it leaves me with considerable doubt as to whether he has been lawfully subjected to the death penalty in light of the state's alleged *Brady* violation.

The case against Spirko is far from overwhelming. It is substantially based upon three evidentiary pillars: (1) an eyewitness who was "100% sure" that Spirko's best friend, Delaney Gibson, was at the Elgin, Ohio post office when the postmistress was abducted, (2) another eyewitness who was "70% sure" that Spirko was also at the scene, and (3) Spirko's knowledge of factual details concerning the murder that were not known to the general public. Each of these pillars, however, has a foundation of sand. The "certain" identification of a clean-shaven Gibson is cast in grave doubt both by photographs and receipts in the possession of the state, but not disclosed to the defense, indicating that Gibson had a full beard immediately before the date of the abduction, and by statements made to investigators by several people who said that Gibson had a full beard during the entire summer of 1982. As for Spirko's presence at the scene, a confidence level of only 70% is far from "beyond a reasonable doubt." Finally, Spirko's knowledge could have come from second-hand repetition rather than first-hand participation.

A striking fact about the record in this case is the complete absence of any forensic evidence linking Spirko to the crime. There are no fingerprints, footprints, fibers, blood, or stolen items to bolster the state's case. Nor is there any written or recorded confession of guilt by Spirko or incriminating testimony by a witness who turned state's evidence. (Although two of Spirko's former cellmates testified at trial that Spirko admitted to them that he murdered Mottinger, those cellmates have subsequently recanted their testimony, either directly or indirectly.) We are thus left with nothing other than the three shaky pillars described above. This does not negate the fact that a jury could, in a fairly conducted trial, find Spirko guilty beyond a reasonable doubt; but the closeness of the question obviates the possibility of harmless error and requires us to be more sensitive to any material procedural violations by the state. *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (stating that "petitioner should receive the benefit of the doubt" in a capital case where "there is a real possibility that the wrong man is to be executed").

#### II. ALLEGED BRADY VIOLATION

The alleged procedural violation that is key to this appeal is the very one discussed by the majority opinion—Spirko's claim that the state failed to turn over to him exculpatory and impeachment information that would have materially aided his defense. Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id*. at 87. The Supreme Court has summarized the components of a *Brady* violation as follows:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice exists "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

On habeas review, a federal court must ask whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quotation marks omitted). "Allegations of violations of *Brady v. Maryland*, 373 U.S. 83 (1963), present mixed questions of law and fact which this Court reviews de novo." *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000) (parallel citations omitted).

Because Spirko initiated his federal habeas corpus action in March of 1995, prior to the effective date of AEDPA, we apply the pre-AEDPA version of 28 U.S.C. § 2254. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Federal courts, prior to AEDPA, were required to hold an evidentiary hearing "[w]here the facts are in dispute" and "the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Townsend v. Sain*, 372 U.S. 293, 312 (1963), overruled on other grounds by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 6 (1992).

**A.  Is the evidence in question favorable to Spirko?**

The first step in analyzing the *Brady* issue is to ask whether the withheld evidence is favorable to Spirko as either exculpatory or impeaching. At trial, the state's theory of the case was that Spirko and Gibson jointly abducted and murdered Mrs. Mottinger. In support of this theory, the state elicited the testimony of Opal Siebert, who lived across the street from the Elgin post office. Siebert testified that she was

"100% sure" that she saw Spirko's friend Gibson outside the post office on the morning of August 9, 2002. When interviewed on the day of the incident, Siebert described the man she had seen as clean-shaven. She also selected a photograph of a clean-shaven Gibson from an array in late January of 1983, more than five months after the crime occurred.

The withheld evidence directly contradicts both the government's theory of the case and Siebert's testimony. Gibson told investigators that he was in North Carolina on August 9, 1982. His story was at least partially corroborated by interviews with Gibson's wife, Margie, and with Margie's sister and brother-in-law, Brenda and Michael Bentley, who accompanied the Gibsons on the trip to North Carolina. The Bentleys told investigators that they had last seen the Gibsons in Asheville, North Carolina at approximately 6 p.m. on August 8. Asheville is roughly 500 miles away from Elgin, Ohio.

Although the state informed Spirko that investigators had spoken with Margie Gibson and Michael Bentley, it failed to disclose the fact that the investigators had received physical evidence during those interviews. The Bentleys provided the investigators with receipts from an automotive store in North Carolina dated August 7 and from a hotel in Newport, Tennessee where the Bentleys stayed on the night of August 8, along with 40 photos of themselves and the Gibsons that were allegedly taken that weekend. Margie Gibson provided investigators with 18 similar photos allegedly taken during the same period of time. All of the photos showed Gibson with a full beard. These photos and the receipts corroborate Gibson's alibi and therefore tend to prove, although they cannot conclusively demonstrate, that both the government's theory of the case and Siebert's eyewitness identification were faulty. Because the withheld physical evidence appears to be both exculpatory and impeaching, it is favorable to Spirko within the meaning of *Brady*.

**B. Was the evidence at issue suppressed by the state?**

*Brady* next requires us to determine whether the evidence in question was suppressed by the state. This court has held that *Brady* is not violated where the defendant is "aware of the essential facts that would enable him to take advantage of the exculpatory evidence," even if the government does not disclose the evidence itself. *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990).

In *Todd*, the government refused to disclose reports prepared after FBI interviews with Todd's brother and the brother's girlfriend. *Id.* at 404. This court concluded that no *Brady* violation occurred because Todd was informed before trial that both interviewees had potentially exculpatory information, and Todd had an opportunity to interview them. *Id.* at 405. The "essential facts" in *Todd*, then, were the identities of the two potential witnesses; once Todd had that information, he was free to interview them in order to obtain the exculpatory evidence.

In the present case, in contrast, the issue is not whether Spirko could have interviewed the Gibsons and the Bentleys, but whether he could have obtained the photos and receipts that they had given to the state. The prosecution informed Spirko only that "pictures are purported to have been taken of the weekend in question." This statement is misleading. A statement informing Spirko that investigators *had received pictures* that were purportedly of the weekend in question would have been accurate; but it was entirely incorrect for the prosecution to say that "pictures are purported to have been taken . . . ." At the time the statement was made, the prosecution knew that photos had in fact been taken and were in the state's possession. There was nothing "purported" about those facts. But the statement to Spirko suggested that the state possessed no photos. And the prosecution made no mention of the Bentley's receipts that tended to corroborate Gibson's presence in North Carolina on the date of the abduction.

Unlike the situation in *Todd*, Spirko was not "aware of the essential facts that would enable him to take advantage of the exculpatory evidence." 920 F.2d at 405. The "essential facts" in this case appear to be that the state possessed material photos and receipts, and these facts were not disclosed to Spirko. *Todd* is therefore distinguishable. Spriko has thus presented a prima facie case that the physical evidence at issue was suppressed by the state, satisfying the second component of a *Brady* violation.

**C. Was Spirko prejudiced by the suppression of the favorable evidence?**

The final step in the *Brady* analysis is to determine whether Spirko was prejudiced by the state's suppression of evidence favorable to his defense. In other words, does the suppression of the pertinent evidence "undermine[] confidence in the outcome of the trial"? *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quotation marks omitted). This question effectively requires us to assess the probability of a different outcome if the state had disclosed its possession of the photos and receipts to Spirko. Spirko has presented some evidence on this point. His trial counsel have signed affidavits stating that they doubted the credibility of Gibson's alibi and therefore did not pursue that line of defense. The lawyers contend that if they had known about the evidence corroborating Gibson's alibi, they would have used that evidence to attack the state's case at trial.

Whether this would have been sufficient to change the jury's verdict or Spirko's sentence is very much in dispute. The majority contends that using the Gibson alibi evidence would have actually *increased* Spirko's chances of conviction and a death sentence because

the Gibson evidence not only does not eliminate Spirko as the perpetrator, it eliminates his best defense. If Gibson was not a participant in the murder, then he was not, as Spirko told the investigators and claimed at trial,

the source of all of Spirko's detailed knowledge of the crime. And if Spirko did not learn the details of this crime from Gibson, from whence did all of that detail come?

Maj. Op. at 15. But Spirko presents an equally plausible, but very different, outcome:

> If the prosecution had fulfilled its *Brady* obligations, Mr. Spirko would not have testified as to Delaney Gibson's alleged involvement. . . . Moreover, had the prosecution turned over the *Brady* material, Mr. Spirko's attorneys could have used it to show that his statements to investigators concerning Delaney Gibson—like all of his other statements—were not true. . . . Armed with this evidence, the defense would have destroyed the prosecution's fundamental theory of the case, would have completely undermined Mrs. Siebert's testimony, and would have discredited Mr. Spirko's statements to investigators concerning Delaney Gibson. Such evidence plainly would have had a significant impact on the overall trial . . . .

Spirko further states that

> even if [his] statements to investigators included information that only someone involved in the crime could know, such statements do not demonstrate that [he] was involved in the crime. He could well have obtained the information from someone who was (or even was not) involved in the crime or he could have obtained the information from the investigators themselves.

Spirko's arguments are at least plausible. I am therefore unable to say with confidence that the prosecution's failure to disclose the photos and receipts was harmless. Because "the government's evidentiary suppression undermines confidence in the outcome of the trial," "[a] reasonable probability of a

different result is accordingly shown." *Kyles*, 514 U.S. at 434 (quotation marks omitted).

The Fifth Circuit made this point in a similar case involving an alleged *Brady* violation: "This is a capital case . . . and one moreover in which our reading of the evidence shows there is a real possibility that the wrong man is to be executed. In such a case, if ever, petitioner should receive the benefit of the doubt." *Lindsey v. King*, 769 F.2d 1034, 1043 (5th Cir. 1985); *see also Kyles*, 514 U.S. at 422 (stating that a federal court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case"). Like the Fifth Circuit in *Lindsey*, we are dealing with a capital case where the defendant's conviction and death sentence rests on relatively weak evidence—the three shaky pillars discussed above. I therefore believe that any doubt about whether there is a reasonable probability of a different result should be resolved in favor of Spirko.

### III. EVIDENTIARY HEARING

For all of the reasons set forth above, this court should remand the case to the district court for an evidentiary hearing on Spirko's *Brady* claim. Under pre-AEDPA law, which we must follow in this case, a habeas petitioner is entitled to an evidentiary hearing if "for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend v. Sain*, 372 U.S. 293, 313 (1963), overruled on other grounds by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 6 (1992). Spirko points out that, despite his requests, he has not received an evidentiary hearing on his *Brady* claim in any state or federal court. An evidentiary hearing would allow the district court to determine whether the state in fact violated Spirko's constitutional rights by not turning over to the defense the photos and receipts in its possession. Accordingly, this court should vacate the judgment of the district court and remand the case for an evidentiary hearing on Spirko's *Brady* claim.