NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0799n.06

No. 10-5012

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Nov 30, 2011*

LEONARD GREEN, Clerk

BILLY JEFFRIES,                          )
                                         )
    Petitioner-Appellant,            )    ON APPEAL FROM THE
                                         )    UNITED STATES DISTRICT
    v.                               )    COURT FOR THE EASTERN
                                         )    DISTRICT OF KENTUCKY
JAMES MORGAN,                            )
                                         )
    Respondent-Appellee.             )
                                         )

BEFORE: ROGERS, McKEAGUE, and DONALD,[*] Circuit Judges.

ROGERS, Circuit Judge. Billy Jeffries appeals from the district court's denial of his habeas

corpus petition. Jeffries is serving a thirty-five-year state prison sentence for the 1995 murder and

attempted rape of Mary Evelyn McKee in Shelbyville, Kentucky. Jeffries argues that the prosecution

failed to disclose material evidence as required under *Brady v. Maryland*, and that there was

insufficient evidence to support his conviction. Even assuming that the prosecution should have

disclosed the evidence at issue, the failure does not amount to a *Brady* violation because disclosure

of the suppressed evidence would not have been reasonably likely to change the outcome of the trial.

Jeffries' sufficiency of the evidence claim is without merit because there was sufficient

circumstantial and forensic evidence from which a reasonable jury could conclude that Jeffries had

---

[*] At the time this case was argued, the Hon. Bernice B. Donald was a district judge, sitting
by designation. On September 8, 2011, Judge Donald became a judge of the Court of Appeals for
the Sixth Circuit.

committed the crimes. Therefore, there are no grounds for granting the petition, and affirmance is required.

Mary Evelyn McKee, a 77-year-old widow, was murdered in February of 1995. A neighbor saw McKee taking her usual afternoon walk around 5:30 on February 20. The next day, McKee's housekeeper found McKee's house empty and in a pre-dinner state, leading to the conclusion that McKee had never returned from her walk. McKee's body was found behind a house in the neighborhood early that evening. She had been killed by repeated blows to the head with a rock. Her shirt was partially open, her skirt was lifted mid-way up her legs, and her pantyhose and panties had been removed. Muddy fingerprints were found on McKee's thigh and buttocks. There was also a palm print on McKee's glasses, which were found folded beside her body. A head hair not belonging to McKee was found in her pantyhose.[1]

On the same day on which McKee was last seen, several teenagers had gathered at a house in the neighborhood to pass the President's Day holiday. Jeffries attended the get-together and, along with at least two other boys, drank whiskey during the afternoon. On February 27, the police questioned Jeffries about his whereabouts following the party. At that time, the police already suspected Jeffries' involvement with the murder—based, at least in part, on interviews with other teenagers who placed Jeffries near the crime scene soon after McKee was last seen. The officers

---

[1] In his brief, Jeffries argues that the hair was found in McKee's panties and not her hose, but the trial testimony shows that the hair was found in her hose.

asked Jeffries to turn over clothes he had worn on February 20 and to walk the officers through the path he had taken after leaving the party.

Jeffries was arrested on March 2, 1995. He gave the police a statement and submitted finger and palm prints that day. Jeffries was tried in March of 1997. The bulk of the trial testimony explains the forensic evidence in the case. Analysis of Jeffries' clothing revealed small amounts of blood on his jacket and shoe, but the quantity was inadequate to determine whether the blood was even human. However, a spot of blood on the inside tongue of Jeffries' left shoe was matched to McKee. Further, Jeffries' palm print was matched to the print on McKee's glasses. The hair found in McKee's pantyhose did not belong to Jeffries, and fibers found on her clothing were not matched to McKee's or Jeffries' clothing.

In addition to the forensic evidence, the Commonwealth presented two witnesses who testified to having seen Jeffries in the area where McKee's body was found around the time of the murder. The prosecution also presented the testimony of Kay Franklin, a seamstress who stated that she had repaired a tear in Jeffries' jacket in the days following the murder.

Jeffries testified in his own defense, but no longer disclaimed all knowledge of the crime. Instead, he testified that he had started toward a nearby park after leaving the party, changed course, cut through the yard where McKee's body was found, tripped over her body, and then ran toward home in terror. Jeffries' father also testified that he was driving around the neighborhood looking for Jeffries on February 20, encountered him close to their home, began yelling at him for being late for a 6:00 p.m. appointment, and then drove him home. Jeffries testified that he did not tell his

parents about the body because they were already upset with him and telling would require a confession that he had been drinking. He stated that he did not initially tell the police about the body because he knew he was not involved and was sure that they would find the perpetrator. He explained that he had later lied to the police because he did not want them to know that he had been "right there." The jury convicted Jeffries on March 21, 1997. Jeffries appealed, arguing that there was insufficient evidence to support the conviction. The Supreme Court of Kentucky rejected that argument in an unpublished opinion that emphasized the forensic evidence and testimony placing Jeffries near the crime scene.

Post-trial developments provided Jeffries a new avenue for challenging the conviction. In March 1998, Jeffries' counsel received a letter from the Kentucky Attorney General explaining the results of an investigation into various third-party statements implicating another man, John Dillon, in McKee's murder. None of those statements had been known to the Commonwealth before the trial. However, the police had briefly investigated Dillon soon after the murder, based on a tip officers received while canvassing the neighborhood. A neighbor (who was also Dillon's probation officer) reported having seen Dillon with an unidentified white male (not Jeffries) half an hour before the crime was committed, about .7 mile from where the body was found. The police called Dillon in for questioning and ruled him out as a suspect based on his uncorroborated alibi that he had been with a girlfriend on the night in question and on his grandmother's assurance that she had been keeping a close eye on him. Jeffries' trial counsel was not notified that the police had interviewed Dillon even though counsel had requested a list of all individuals the police had considered to be

suspects during the investigation, including anyone who had been questioned in connection with the crime. His counsel did receive the investigation notes containing the probation officer's tip.

Jeffries sought a new trial, claiming that the prosecution's failure to disclose that Dillon had been interviewed in connection with the murder amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), because the undisclosed information was material.[2] Jeffries attached two affidavits to the motion: (1) Nikki Chesser's affidavit stating that Dillon admitted killing McKee and had threatened to hurt her if she told anyone; and (2) Chris Beach's affidavit stating that he had overheard Dillon declare his involvement in the killing. There were no affidavits from the other individuals who were named in the letter provided to Jeffries' counsel by the Attorney General's office, and Chesser and Beach did not testify at the hearing on the motion for a new trial. Jeffries' counsel did call three investigating officers to testify at the hearing—Detective Barbiarz, who originally interviewed Dillon; Detective Stephens, who received some of the post-trial statements about Dillon's involvement; and Detective Pratt, who was involved with the original investigation and also investigated the post-trial allegations. Detective Pratt testified that when he conducted a post-trial interview with Dillon, Dillon restated his alibi that he had been with a girlfriend on the night in question. Pratt stated that he believed Dillon had identified the girlfriend as Jessica Peyton.

---

[2] His new trial motion was originally premised on the theory that the prosecution had failed to reveal its knowledge of the third-party accounts of Dillon's confessions, but it was clarified that the Commonwealth learned of these statements only after the trial. Jeffries' claim was allowed to proceed, however, because of the pre-trial non-disclosure of the Dillon interview.

The trial court denied the motion for a new trial but ordered a grand jury investigation into Dillon's possible involvement in the crime. At the grand jury proceedings, Jessica Peyton testified that she was not living in Shelby County at the time of the murder and had never been romantically involved with Dillon. After hearing from Peyton and others, the grand jury did not indict Dillon. The Kentucky Court of Appeals affirmed the denial of the motion for a new trial in October 2003.

Jeffries brought his habeas petition in the Eastern District of Kentucky in September 2005, and the case was referred to a magistrate judge. On March 20, 2006, Jeffries moved for leave to expand the state court record. The magistrate judge issued his report and recommendation that the petition be denied on the merits on April 11, 2006. R.14. The magistrate judge denied Jeffries' motion to expand the record as moot. R.14 at 28. The district court adopted the report and recommendation on May 2, 2006, R.16, and Jeffries subsequently applied for a certificate of appealability on the *Brady* claim, the insufficiency of the evidence claim, and his motion to expand the record, R.20. The district court granted the COA on the *Brady* claim but denied the other two grounds. On January 17, 2007, this court expanded the COA to include the two excluded grounds. On April 14, 2008, this court remanded the case to the district court with instructions "that the entire trial record be reviewed by the district court in assessing Jeffries' petition." *Jeffries v. Morgan*, 522 F.3d 640, 645 (6th Cir. 2008). The case was again referred to the original magistrate judge, who issued a sixty-six-page supplemental report and recommendation that again recommended denying Jeffries' petition. The district court adopted the supplemental report except for three factual findings that are not relevant to our disposition of the case. The district court denied the petition on

December 10, 2009. Jeffries applied for a second COA on his *Brady* and sufficiency of the evidence claims. R.44. The district court granted the COA on January 20, 2010.[3]

The failure to disclose the fact and contents of the Dillon interview was not a *Brady* violation because the suppression does not undermine confidence in the outcome of the trial. *See United States v. Warshak*, 631 F.3d 266, 300 (6th Cir. 2010). Jeffries argues that the undisclosed Dillon interview satisfies *Brady*'s materiality requirement, 373 U.S. at 87, in two respects. First, Jeffries contends that his defense was deprived of evidence that would have bolstered the defense trial strategy of questioning the quality of the police investigation. Second, he argues that disclosure may have prompted independent investigation of Dillon's alibi which would, in turn, have revealed at least that the alibi was fraudulent and perhaps that Dillon and a still-unidentified white male had actually killed McKee.

Evidence that discredits the police investigation may be material under *Brady*, *see Kyles v. Whitley*, 514 U.S. 419, 446 (1995), but the Dillon interview does not rise to that level because it was merely cumulative for attacking the investigation's reliability, *see Brooks v. Tennessee*, 626 F.3d 878, 893 (6th Cir. 2010). The investigators' ready acceptance of Dillon's alibi may have bolstered the defense's argument that the police's exclusive focus on Jeffries caused them to ignore viable leads in the case. However, Jeffries was able to present that argument in other ways throughout the

---

[3] We review the district court's determinations *de novo*. It is not necessary for us to determine the extent to which AEDPA applies to the state court's determinations, as affirmance is required regardless.

trial. Jeffries' trial counsel's opening statement emphasized that "from day one—day one—Billy Jeffries was their suspect, and they looked no further," and pointed out that "the spot of blood on the tennis shoe and the palm prints" were "collected after Billy Jeffries was already arrested and charged with this crime." Defense counsel stated that during a neighborhood canvass, "[n]eighbors tried to describe what was going on . . . any suspicious people. . . . You're not going to hear of any follow-up investigations on any of these people."

Trial counsel repeatedly highlighted the early and narrow focus on Jeffries when cross-examining the Commonwealth's witnesses. In cross-examining Detective Barbiarz, counsel pointed out that Barbiarz took a description of Jeffries' clothing within hours of the McKee autopsy, long before any forensic evidence had been analyzed and in spite of the fact that the door-to-door canvass did not produce anyone saying that Jeffries had been seen with McKee that evening. Pet'r App'x at 202-05. Counsel also pointed out that investigators took only Jeffries' clothes for blood and fiber analysis even though the only evidence implicating him at that point was two other party attendees' statements that they had seen Jeffries near where McKee's body was found. Pet'r App'x at 216-17. In questioning forensic witnesses, Jeffries' lawyer emphasized that certain fibers found at the scene had never been analyzed and that the fibers and hair that were analyzed did not match Jeffries' clothing or hair. Pet'r App'x at 305-26. Trial counsel summarized all of this in closing and stated that "[w]e don't know who else had the opportunity, because as you heard them say, no other

descriptions of anybody was [sic] taken." Pet'r App'x at 657.[4]  Given the abundance of evidence put forth by Jeffries' counsel that the police had focused solely on Jeffries from the outset of the investigation, the Dillon interview would have been, at most, cumulative on this point.[5]  Therefore, Jeffries' argument that information about the interview was material because it casts doubt on the integrity of the investigation cannot support a *Brady* claim.

Jeffries also argues that knowledge of the Dillon interview could have changed the defense's theory of the case.  Rather than being forced to depict the crime as having become virtually unsolvable as a result of shoddy police work, Jeffries claims he could have pointed to actual alternative suspects: Dillon and his unidentified white companion (providing a source for the hair found in McKee's hose).  Had the contents of the interview been revealed, Jeffries argues, his trial counsel may have noted investigators' uncritical acceptance of Dillon's thin alibi.  This may have led trial counsel to undertake an independent investigation of Dillon's story, which would not have held up because Jessica Peyton, the name Dillon later provided as the girlfriend he had been visiting, did not even live in Shelby County at the time of the murder.  Had trial counsel determined that Dillon's alibi was false, the theory proceeds, they could have informed the jury that another suspect's

---

[4] The defense's repeated claim that the police did not take other descriptions is called into question by the record.  Investigators' notes from an interview with Ben Mills, Jr. contain a description of Scotty King's clothes and build. R.2-8 at 9.  King was also at the party and drinking on February 20.  The notes provided do not show, however, that investigators talked with King, and he was never asked to provide his clothes for analysis.

[5] Evidence of the interview could actually have undermined the attack on the investigation, since Dillon was interviewed after Jeffries' arrest.

alibi had not checked out. Perhaps they would have also undertaken further investigation that may have led them to the people who eventually implicated Dillon in McKee's death.

This aspect of Jeffries' *Brady* claim is substantially undercut by the police notes that were disclosed, which contained the probation officer's tip that Dillon had been seen in the area near the time of the offense. Those notes, which Jeffries' counsel mentioned in general terms during opening statements, clearly state that Dillon was within .7 mile of the crime scene in the half hour before McKee was last seen alive. The notes even mention that Dillon was with an unidentified Caucasian male. Given that Dillon had a known criminal history (albeit one he had established in concert with Jeffries) and that Jeffries' trial counsel was advancing a theory that the police had overlooked the real perpetrator, the tip in the notes was sufficient to trigger further investigation. Jeffries argues that if his counsel had known that the police had considered and cleared Dillon as a suspect, counsel would have become more suspicious of Dillon than when they believed he had been completely ignored.

Although he downplays the disclosure of the probation officer's tip, Jeffries' knowledge of the tip precludes finding a *Brady* violation. This circuit determined that no *Brady* violation had occurred in *Spirko v. Mitchell*, 368 F.3d 603, 610-11 (6th Cir. 2004), where the defendant was otherwise on notice of the information contained in notes on which he tried to stake a *Brady* claim—in that case, evidence suggesting that an alleged accomplice may have been out of state at the time of the crime. The court emphasized that a defendant only need have "the essential facts that would enable him to take advantage of the exculpatory evidence," rather than all of the

state's evidence on the point in question. *Id*. at 611. Because Jeffries was on notice that John Dillon had been seen close to the crime scene at the relevant time, the prosecution's failure to identify Dillon as a suspect or to reveal that he was questioned does not amount to a *Brady* violation.

A rational juror could find beyond a reasonable doubt that Jeffries had murdered and attempted to rape McKee. The district court therefore properly rejected Jeffries' sufficiency of the evidence claim. Based on witness testimony placing Jeffries near the scene, Jeffries' palm print on McKee's glasses, McKee's blood on Jeffries' shoe, and Jeffries' admitted lies to investigators, a jury could reasonably conclude that he had committed the alleged crimes. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The partial state of undress in which McKee's body was found supports a conviction for attempted rape.

Jeffries argues that there was insufficient evidence to advance the theory that he alone committed the crime. The basis for this claim is the hair and fiber evidence that did not match Jeffries or McKee, the fact that Jeffries' clothing did not have substantial amounts of blood, and that Jeffries was only 110 pounds at the time of the murder—and therefore not physically strong enough to carry the victim from the road to the spot where she was found. But a rational jury could have reasonably discounted this evidence. There was trial testimony that hair and fibers easily transfer in the course of daily life. The jury could rationally conclude that the fibers that were not matched to the clothing Jeffries and McKee were wearing on February 20 came from someone else that one of them had encountered before the crime, or even from other clothes in McKee's closet. The Commonwealth's brief suggests that the jury may have concluded that the hair found in McKee's

hose had landed on the hose, which were hanging from a bush at the crime scene, after falling from some passerby's head. Whether this is more or less likely than the defense's theory that the real killer contributed the hair is beside the point, so long as the finding was not completely irrational. As to the fact that only small amounts of blood were found on Jeffries' clothing, the jury could have reasonably concluded that Jeffries had washed his clothes between the time of the crime and the time the police collected them. The Commonwealth Attorney also suggested during closing arguments that perhaps blood would not have spattered onto the perpetrator because of the angle of attack. Pet'r App'x at 688. The jury may have accepted either of these two explanations for the fact that there was only scant blood evidence on Jeffries' clothing. The only evidence that Jeffries was slightly built at the time of the murder was Jeffries' own testimony, which the jury might have discounted as a self-serving exaggeration in light of the fact that he was 6'3" and 200 pounds at the time of trial. *See* Pet'r App'x at 584. Adolescents can grow quite quickly, but without some objective evidence of Jeffries' astounding growth, the jury was not irrational in concluding that he could have been large enough to commit the crime in 1995.

Jeffries argues that his palm print on McKee's glasses is actually exculpatory. The palm print was clean, while there were muddy finger prints on the body. Jeffries contends that the same person could not have contributed the muddy prints on the body and a clean print on the glasses. As noted below, the prints were from different hands—the palm print from the right and the muddy finger prints from the left, and the jury could reasonably have concluded that only Jeffries' left hand had been muddy. Mag. Op. at 21. This explanation is no more difficult to believe than Jeffries' story

that he tripped over McKee's body and planted his palm on her glasses without breaking the lens or the stems. A jury could rationally choose the first explanation over the second, and the lack of mud on the glasses does not exonerate Jeffries.

When the forensic evidence is considered along with the testimony of Ben Mills, Jr. and Ashley Gibbs that Jeffries was near the crime scene at the time of the killing, Kay Franklin's testimony about repairing Jeffries' torn coat soon after the murder, and Jeffries' admission that he had repeatedly lied to the police, a rational jury could reasonably conclude that Jeffries committed the crimes. Therefore, Jeffries' sufficiency of the evidence claim must fail.

For the foregoing reasons, the district court's denial of the petition is affirmed.