NOT RECOMMENDED FOR PUBLICATION
File Name: 08a0115n.06
Filed: February 22, 2008

No. 07-3344

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GARY P. ANTHONY, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES |
| | ) | DISTRICT COURT FOR THE SOUTHERN |
| MICHAEL J. ASTRUE, | ) | DISTRICT OF OHIO |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

**Before: GUY, GILMAN, and McKEAGUE, Circuit Judges**.

**RONALD LEE GILMAN, Circuit Judge**. Gary P. Anthony appeals the denial of his

application for Disability Insurance Benefits (DIB) under the Social Security Act, 42 U.S.C. § 423.

The administrative law judge (ALJ) concluded that Anthony was not disabled, and the district court

affirmed. On appeal, Anthony argues that the ALJ erred in (1) determining that not all of his

impairments were severe, (2) finding that none of his impairments met the criteria for the Social

Security Administration's (SSA's) Listings of Impairments (the "Listings"), (3) failing to properly

acknowledge and give sufficient deference to the opinion of his treating physician, (4) concluding

that Anthony's testimony, and the testimony of his witnesses, was not fully credible, and (5) finding

that he was not disabled because he retained the residual functional capacity to perform a significant

number of jobs in the national economy. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

**A.     Vocational background, impairments, and medical treatment**

Anthony was born in 1948 and received a high school education. He served overseas in the Marine Corps and then worked as a truck driver for most of his life. The last time that he held a job was in 1997.

Anthony was in a serious motorcycle accident in 1978 and was hospitalized for a year. After the accident, he began to experience seizures. Anthony currently complains of memory loss and blackouts, as well as pain in his hip, right leg, and left shoulder. An old fracture in his right leg causes his foot to pronate and creates a degree of instability when he walks on uneven ground. The injury also causes him problems with balance, standing for long periods of time, and climbing stairs. Finally, he has injured tendons in his left hand that prevent him from fully extending his fingers.

The medical evidence in the administrative record consists of the opinions and diagnoses of Anthony's treating physician, Dr. Pecar, and a long list of other doctors and psychologists that includes three neurologists (Drs. Farbman, Kendjelic, and Van Cott), a consultative psychologist (Dr. Bousquet), and a state agency psychologist (Dr. Winter). Anthony has also received additional medical treatment through the Veterans Administration (VA) from Drs. Acharya, Dudley, Estevez, Gardener, Groff, Kahn, Parsons, and Patel.

The pertinent medical records show that Anthony had a grand mal seizure and at least two other seizures in 1997. He began receiving care at a VA hospital in December of 1997, and was diagnosed with a seizure disorder. A doctor prescribed Dilantin to control the seizures.

In 1999, Anthony reported to Dr. Kahn that he had not had a seizure for a year, but stated that he was experiencing memory problems. Later that same year, Anthony sought treatment from Dr. Parsons for an old fracture in his leg. X-rays show some degenerative changes, but no tissue abnormalities. Dr. Parsons, after noting that the condition did not "in any way compromise his ambulation," prescribed shoe inserts. Anthony returned to the VA hospital two months later and complained again of foot trouble. Dr. Groff diagnosed Anthony with malunion of his left tibia, but did not find any "non-union" at the fracture site.

In April of 2000, Anthony reported that he had not had a seizure in two years. A physical examination revealed no abnormalities. Notes from an appointment with Dr. Patel in December of 2000 state that Anthony had not had a seizure since 1997 and that his seizure disorder had been stable since 1998.

In early 2001, Anthony reported momentary spells of blackout and disorientation upon waking. An MRI revealed mild atrophy of the brain, but no abnormalities. Anthony reported memory confusion and signs of night seizures later that year. Dr. Van Cott recommended that Anthony stop driving. Anthony then underwent a neuropsychological evaluation with Dr. Kendjelic in November of 2001. Dr. Kendjelic found that Anthony's intellect was in the low-average range, that his processing speed was borderline, and that he had difficulty performing more than one task at a time. The doctor also determined, however, that Anthony retained a strong ability to learn through repetitive

tasks and could perform well on simple attentional tasks. After Anthony was diagnosed with a cognitive disorder and minor depression, Dr. Kendjelic recommended that Anthony participate in individual counseling and a memory skills group.

Following a neurological examination in January of 2002, Dr. Farbman noted that although Anthony continued to complain about "spells," his EEG tests were normal. A physical examination also revealed no abnormalities. The doctor noted that it was "unclear" if Anthony was still having seizures, but determined that he should stay on Dilantin because his seizure disorder appeared to be well-controlled with the medicine.

A consultative psychological exam was conducted by Dr. Bousquet, a licensed psychologist, in January of 2003. Anthony reported having seizures in 1997 and 1998, but stated that he had not had one in a "good while." He did, however, report dizziness, bouts of anxiety, and forgetfulness. Dr. Bousquet determined that Anthony could process information well if given additional time, and noted that his expression of emotion, insight, reasoning, and judgment were all appropriate. Anthony's full scale IQ was assessed at 75. The doctor diagnosed Anthony with borderline intellectual functioning, but found that his other mental impairments were mild.

In March of 2003, a state agency psychologist, Dr. Winter, reviewed the medical evidence in the record and rated Anthony's functioning in 18 different mental areas. Dr. Winter concluded that Anthony was not significantly limited in 12 areas, but that he was "moderately limited" in his ability to respond to changes in the work setting and to complete a normal workday without interruption, and that he was "markedly limited" in his ability to understand, remember, and carry out detailed

instructions.   The doctor concluded that Anthony's working memory for new information was good and that he could understand and remember simple instructions.

Additional VA hospital records were considered by the SSA Appeals Council and the district court.  The records showed that in 2003 Anthony saw numerous doctors and reported that he had not had a seizure since 1997.  After a neurological examination of Anthony, Dr. Dudley concluded in June of 2003 that Anthony's processing and motor speed had declined, but that his insight and judgment for everyday activities was adequate.  Dr. Dudley confirmed that Anthony had a cognitive disorder and was depressed, and recommended that Anthony attend supportive counseling.  Other doctors who saw Anthony during 2003 noted that he had problems with his tandem gait, but generally concluded that his condition was stable and satisfactory.  In February of 2003, Anthony reported that he had fallen down a few steps and injured himself, that he experienced "daydreams" every two months, and had a "funny feeling" that made him confused every six months.  He also reported migraine headaches.

Dr. Pecar, who first treated plaintiff for his seizure disorder, wrote a letter in June of 2004 stating that Anthony was non-focal, slightly depressed, on anti-seizure medication, and showed signs of decline in his cognitive ability.  The letter concluded that Anthony was "totally and permanently disabled" because of his seizures.

At the administrative hearing, a vocational expert (VE) testified that Anthony could perform only unskilled and low-stress jobs involving routine and repetitive tasks that required little contact with the public.  The VE noted that Anthony could perform jobs such as a hand packer, laundry folder, sorter, grader, inspector, or checker.  On cross-examination, the VE conceded that if Anthony were "off-task" for more than 15 percent of the work day, he would have a "difficult time" working.  There

was no finding by the ALJ, however, that Anthony would be "off-task" to such an extent that he would be unable to perform the jobs listed by the VE. Anthony himself acknowledged that he was able to drive 100 miles a week to attend church, exercise with 20 pound weights, take mile-long walks, mow the lawn, visit family and friends, socialize at the American Legion, prepare meals at home, and manage daily living on his own.

**B.    Procedural history**

Anthony first applied for DIB in April of 1998, alleging disability due to seizures. His application was denied in March of 1999 and he did not appeal. Anthony filed a second application for DIB in September of 2002, alleging disability since March of 1999 that was primarily due to seizures, leg injuries, and borderline intellectual functioning. The SSA denied his claim initially and upon reconsideration. An ALJ affirmed the decision of the SSA after finding that Anthony had failed to establish disability for the time period beginning in March of 1999 and ending in September of 2002. Although the ALJ found that Anthony was severely impaired by a seizure disorder, a prior leg fracture, and a cognitive disorder, he determined that Anthony's impairments did not qualify under any Listing and that Anthony retained the residual functional capacity to perform a range of light work. Relying on the testimony of the VE, the ALJ concluded that despite Anthony's inability to return to his past job as a truck driver, he could perform other jobs, and was therefore not disabled within the meaning of the Social Security Act. The SSA Appeals Council subsequently denied Anthony's request for review, making the ALJ's ruling the final decision of the Commissioner.

In October of 2005, Anthony brought an action in the district court to review the Commissioner's final decision. The assigned magistrate judge issued a Report and Recommendation

(R&R), finding that the ALJ's decision was supported by substantial evidence and recommending that the district court affirm the Commissioner's decision. Over objections by Anthony, the district court adopted the findings and conclusions of the R&R in April of 2007. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

This court exercises de novo review of district court decisions in Social Security cases. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005). We must affirm the Commissioner's conclusions absent a determination that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *see also Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.1994). Even if we were inclined to reach a contrary conclusion of fact, the Commissioner's decision must be affirmed so long as it is supported by substantial evidence. *Kinsella v. Schewiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). Accordingly, we "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

### B. The Social Security Act and disability

The issue on appeal is whether substantial evidence supports the ALJ's determination that Anthony was not disabled during the relevant time period. To be entitled to DIB, a claimant must be "disabled" within the meaning of Title II of the Social Security Act. 42 U.S.C. § 423. Section

423(d)(1)(A) defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." The Act further provides that

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under the above definition, an ALJ is required to follow a five-step sequential analysis set out in the SSA's regulations. *See* 20 C.F.R. § 404.1520. In *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997), this court summarized the five-step analysis as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that

> accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Id. at* 529 *(citing* 20 C.F.R. § 404.1520). Under the first four steps, the claimant has the burden of proof. *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 147-48 (6th Cir. 1990). At step five, however, the burden of proof shifts to the Commissioner. *Id.*

## C.     Anthony's arguments

### 1.     *Severity of impairments*

Anthony argues that the ALJ erred by failing to determine that all of Anthony's various impairments were "severe" at step two. In the Sixth Circuit, the severity determination is "a de minimis hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.* The goal of the test is to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

Discerning exactly which additional impairments Anthony believes should have been found to be severe is far from clear, but his brief makes reference to the after-effects of a broken shoulder, his balance, the effects of a torn flexor tendon in his left hand, and headaches. Anthony's argument, however, is misguided. The ALJ specifically found that Anthony's seizure disorder, cognitive disorder, and the after-effects of his broken leg qualified as severe impairments. Anthony therefore cleared step two of the analysis. This caused the ALJ to consider Anthony's severe and nonsevere impairments in the remaining steps of the sequential analysis. The fact that some of Anthony's

impairments were not deemed to be severe at step two is therefore legally irrelevant. *See Mariarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe). The ALJ, therefore, did not commit reversible err in this regard.

### 2. *Listing of impairments*

Anthony next argues that the ALJ erred in concluding that his leg injury does not meet or equal the criteria under Listing 1.06. He also asserts that the ALJ erred in failing to explain why his fracture does not qualify. Listing 1.06 requires, in part, a medically acceptable image showing there is not a solid union of bone at the fracture site ("nonunion") and evidence that the claimant cannot "ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.06(A),(B); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1).

Contrary to Anthony's assertions, however, the ALJ cited specific reasons for finding that the fracture does not qualify under Listing 1.06. The ALJ determined that although Anthony's physician had found a "malunion," there was no evidence in any of the images of a "non-union." In addition, evidence in the record reveals that Anthony has been walking on the leg for more than two decades, does not experience pain at the fracture site, and can "ambulate effectively" except over uneven ground (i.e., he can walk without the use of a hand-held assistive device). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1). Substantial evidence therefore supports the ALJ's finding that Anthony's leg injury does not meet the criteria for Listing 1.06.

Anthony also contends that the ALJ should have found that his seizure disorder qualifies under Listings 11.02 and 11.03, which address convulsive and nonconvulsive epilepsy. This argument is

waived, however, because he failed to develop the same on appeal. *See United States v. Elder*, 90 F.3d 1100, 1118 (6th Cir. 1996) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). But even if the argument was not waived, the ALJ's determination that Anthony's seizure disorder does not meet the criteria of Listings 11.02 and 11.03 is supported by substantial evidence. The Listing requires that the claimant experience convulsive seizures more than once a month or nonconvulsive seizures more than once a week, despite treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Anthony's medical records, in contrast, reflect the fact that he has gone years without experiencing a seizure. As such, the ALJ did not err in concluding that Anthony's seizure disorder is under control and does not qualify under the Listings.

### 3. *ALJ's weighing of the evidence*

Anthony further contends that the ALJ erred in determining that Anthony has the residual functional capacity to perform a range of light work. Specifically, he argues that the ALJ failed to give proper weight to (1) the opinion of his treating physician, and (2) his own testimony and that of his witnesses. For the reasons set forth below, we conclude that the ALJ reasonably resolved the conflicting medical and testimonial evidence.

### a. *Treating physician*

Anthony argues that the ALJ erred in failing to (1) acknowledge that Dr. Pecar was the treating physician, (2) accord proper deference to Dr. Pecar's opinion, and (3) provide "good reasons" for discounting the opinion. Under the treating-physician rule, the opinions of treating physicians are generally accorded greater weight than the opinions of other physicians. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). When determining the particular weight to give

a medical source, an ALJ should consider (1) the length of the treating relationship, (2) the nature and extent of the relationship, including any specialized knowledge the source may have, (3) the extent to which the opinion is supported by medical evidence, including medical signs and laboratory findings, (4) the extent to which the opinion is consistent with the record as a whole, and (5) whether the opinion is from a specialist on issues relating to his or her specialty. *See* 20 C.F.R. § 404.1527(d)(1)-(6).

An ALJ's decision to deny benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996)). Although the ALJ must give "good reasons" for discounting the weight given a treating source's opinion, *id.*, the ALJ "is not bound by the treating physician's opinions," and such opinions will "receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-31 (6th Cir. 1997) (holding that a treating physician's relevant opinion will not be given controlling weight unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"); *see also* 20 C.F.R. § 404.1527(d)(1)-(6).

Contrary to Anthony's assertion, the ALJ acknowledged Dr. Pecar and gave good reasons for discounting the doctor's opinion. The ALJ first found that Dr. Pecar's opinion was not supported by objective findings or treatment notes. Dr. Pecar's medical records do not provide evidence that Anthony's seizures were problematic between 1999 and 2002, the time period relevant to this case. The

determination by Dr. Pecar that Anthony was totally disabled was made in June of 2004. But the last time that Anthony had seen Dr. Pecar prior to June of 2004 was in 1998. There is no evidence that Dr. Pecar treated Anthony between 1999 and 2002. The ALJ therefore reasonably discounted Dr. Pecar's opinion as to Anthony's disability during the critical period of time.

In addition, the ALJ found that Dr. Pecar's conclusion that Anthony could not work was not supported by detailed clinical findings. Where a treating doctor makes broad "conclusory formulations, regarding the ultimate issue which must be decided by the Secretary, [those findings] are not determinative of the question of whether or not an individual is under a disability." *Kirk*, 667 F.2d at 538; *see also King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (finding as a valid reason not to accept the opinion of a treating physician the fact that the opinion was not supported by detailed clinical or diagnostic evidence).

The ALJ also gave Dr. Pecar's opinion limited weight because it was inconsistent with the substantial weight of the medical evidence in the record. This medical evidence belies Anthony's reliance on the alleged severity of his seizures, the torn flexor tendon in his left hand, his problems with dizziness, balance, and coordination, the after-effects of his broken shoulder and leg fracture, his episodes of confusion and irritability, and his brain atrophy. In particular, the ALJ relied on the VA hospital reports between 1999 to 2002, which consistently state that Anthony had not had a serious seizure since 1997, that his seizure disorder was stable and controlled by medication, and that his other ailments were not disabling. Although there is evidence indicating that Anthony might have had some night seizures, that he experienced "spells," and that his cognitive capacity diminished during the

relevant time period, the weight of the medical evidence suggests that Anthony's seizures were under control and that his other ailments did not prevent him from engaging in gainful activity.

The ALJ also considered the full medical record and sufficiently accommodated all of Anthony's limitations in determining his residual functional capacity. Because the VA hospital reports undermine Dr. Pecar's opinion that Anthony could not work in any capacity, and because Dr. Pecar was the only physician to suggest that Anthony was "totally disabled," the ALJ provided sufficient reasons for discounting Dr. Pecar's testimony and determining that, based on the medical record as a whole, Anthony retained the residual functional capacity to perform a limited range of light work.

### b.        The ALJ's credibility evaluations

Anthony further contends that the ALJ erred in finding that his testimony, as well as the verbal and written testimony of his sister, niece, and former employer, was not fully credible. Where the uncontroverted medical evidence in the record is entirely *consistent* with a witness's testimony, an ALJ may not disregard that evidence by claiming that it is incredible. *Harris ex rel Harris v. Heckler*, 756 F.2d 431,436 (6th Cir. 1985). An ALJ faced with *conflicting* medical evidence, however, must necessarily make credibility determinations. *King*, 742 F.2d at 974. Where there are conflicts regarding the evidence, an ALJ's findings of credibility are entitled to great deference. *Id.* at 974-75.

In the present case, the conflicting evidence in the record required the ALJ to evaluate the credibility of Anthony and his witnesses. The ALJ found that the medical record contradicted the witnesses' testimony that Anthony was totally disabled. He pointed out that although the VA hospital records reflect that Anthony had trouble focusing and staying on task, they also made clear that his seizures were largely under control and that he was able to perform most tasks with additional time.

The ALJ also found that Anthony's lifestyle and demeanor did not "match his allegations of disability." He noted that although Anthony claimed to be totally disabled, he continued to drive more than 100 miles to church each week, lift dumbbells, socialize, walk long distances, and live on his own. The ALJ commented that this "does not create the image of a person incapable of work." Because the ALJ considered the evidence in the record and provided specific reasons for his credibility findings, his decision is entitled to great deference and is supported by substantial evidence. *See King*, 742 F.2d at 974; *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (holding that an ALJ's credibility determinations must be upheld so long as they are in the zone of reasonable choices).

### 5. *ALJ's determination that Anthony could work in the national economy*

The ALJ determined that Anthony lacked the residual functional capacity to perform his past work as a truck driver. At step five of the analysis, however, the ALJ found that Anthony possessed the residual functional capacity to perform other jobs in the national economy. Anthony argues that this finding was in error. Specifically, he asserts that the ALJ erred by (1) failing to credit the portions of the VE's testimony that were favorable to him, and (2) improperly applying the medical-vocational guidelines. In response, the Commissioner argues that the ALJ considered and accommodated all of Anthony's limitations in setting his residual functional capacity, treated the medical-vocational guidelines as advisory, and properly relied upon the testimony of the VE in determining that Anthony could perform a sufficient number of jobs in the national economy during the relevant time period.

The Commissioner carries the burden of proving that a claimant who cannot perform his past work has the residual functional capacity to perform other work in the national economy. *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 148 (6th Cir. 1990). To carry this burden, the Commissioner

may rely either on the testimony of a VE who evaluates a claimant's ability to perform work in light of the claimant's limitations or the SSA's medical-vocational guidelines. 20 C.F.R. §§ 404.1520, 416.920.

In Anthony's case, the ALJ did not err in applying the medical-vocational guidelines. The ALJ determined that Anthony had both exertional and nonexertional impairments that eroded his ability to perform the full range of light work. Where a claimant has nonexertional impairments, the Commissioner must treat the medical-vocational guidelines as only a framework for decisionmaking and must rely on other evidence to carry the burden of showing that there are a significant number of jobs in the national economy that a claimant can perform. *Burton v. Sec'y of Health & Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990) (holding that if a claimant suffers from a nonexertional impairment, the Commissioner may use the grid as a framework for decision, but must rely on other evidence to carry his burden); 20 C.F.R. § 404.1567 . Here, the ALJ specifically stated that, due to the nature of Anthony's limitations, he was applying the guidelines only as a framework. He then relied on the testimony of the VE to conclude that Anthony could perform a significant number of jobs in the national economy.

The Commissioner may carry his burden of proof by relying on a VE's testimony if the testimony is "given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). At the hearing, the ALJ accurately listed Anthony's traits and residual functional capacity and asked the VE what jobs Anthony could perform. The VE replied that an individual with Anthony's limitations could perform jobs such as hand packer, laundry folder, sorter, grader, inspector, or checker.

In response to an altered hypothetical posed by Anthony's attorney, however, the VE testified that, if a hypothetical individual were "off-task" for more than 15 percent of the work day, he would have "a

difficult time" working. But the VE's response to the altered hypothetical provides no basis for us to overrule the ALJ's determination that Anthony was qualified for a significant number of jobs in the national economy. *See Felisky*, 35 F.3d at 1035 (holding that an appellate court may not overrule an ALJ simply because that court might have reached a different conclusion based on the facts). Because the VE's testimony in response to the valid hypothetical question posed by the ALJ was supported by substantial evidence, the ALJ did not err in relying on the VE's opinion.

### 6. *Anthony's earlier request for remand*

Anthony argued before the district court that his case should be remanded to consider additional evidence from the VA hospital records. The district court denied his request, and Anthony does not dispute that decision here. Consequently, Anthony has waived this argument. *See Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 1994) (holding that the failure to develop an argument constitutes a waiver).

### III. CONCLUSION

The administrative record contains substantial evidence to support the Commissioner's conclusion that Anthony is not disabled within the meaning of the Social Security Act. We therefore **AFFIRM** the judgment of the district court.