NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0658n.06
Filed: October 31, 2008

No. 07-4355

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| REBECCA McGLOTHIN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| COMMISSIONER OF SOCIAL | ) | SOUTHERN DISTRICT OF OHIO |
| SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

Before: COLE and GIBBONS, Circuit Judges; FORESTER, Senior District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-Appellant Rebecca McGlothin appeals from the judgment of the district court affirming the Commissioner of Social Security's denial of her application for benefits. For the reasons that follow, we affirm.

I.

McGlothin, a resident of Dayton, Ohio, was forty-eight years old when she applied for Disability Insurance Benefits and Supplemental Security Income. A high school graduate, she had worked as a cashier, dishwasher, laborer, and food preparer. Before discontinuing work and applying for benefits in August 2002, McGlothin worked as a cashier in a grocery store. Her health

---

[*]The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

problems included a decade-long history of heart problems with multiple hospitalizations for bypass surgeries and angioplasties. McGlothin had also been treated for thoracic outlet syndrome after she developed pain in her right shoulder while shoveling snow during employment at a gas station in 1985. Additionally, McGlothin suffered from depression and anxiety.

McGlothin submitted her application on August 19, 2002. She alleged that she was disabled due to "bypass surgery '92, HBP [high blood pressure], heart problems" as of August 12, 2002. McGlothin's primary complaints were of weakness and shakiness in her arms and hands as well as pain in her shoulders, arms, and hands. In a self-report dated February 24, 2003, McGlothin reported pain and shakiness in her shoulders, arms, and hands causing significant limitations in her daily activities. She wrote: "[S]houlders feel like pin cushion with ice pikes going from shoulders to elbows hurts just to have my arms hang not sleepin cause of pain toss turn no rest then will sleep for 10 to 12 hours." She reported that she "can't raise [her] arms above [her] head hardly long enough to pull on a shirt"; that "sometimes [she] can't get food to [her] mouth for shaking too much"; that she had difficulty driving because she "can't control the shakes enough to be steady at the wheel"; and that she no longer enjoyed her hobbies of sewing and basketball because she "cannot hold a needle to sew. Cannot play basketball cause [she] can't raise [her] arms anymore." She further reported that she wore wrist braces 24 hours a day. McGlothin also reported anxiety and depression and wrote "sometimes feel like I have no control over anything." She indicated that her family doctor had referred her to a psychiatrist for bipolar tendencies and that she intended to make an appointment.

McGlothin's application was denied initially and on reconsideration, and McGlothin filed

a timely request for a hearing before an Administrative Law Judge ("ALJ"). A *de novo* hearing was held on March 11, 2004 before ALJ Melvin A. Padilla. McGlothin, represented by counsel, appeared and testified at the hearing. At the hearing, McGlothin again complained of pain and "shaking" in her neck, shoulders, back, and arms. She stated that her hands "don't work like they used to anymore" and that she could no longer wash the dishes. McGlothin stated that her neurosurgeon had recommended wrist braces and physical therapy but that neither had helped. She described her "shaking" as "like somebody sticking pins in my shoulders and then I just end up shaking and pain going down my back and up into my head." She described her back pain as "in the middle of my back between my shoulder blades like somebody hit me with a baseball bat." In response to questioning, McGlothin stated that surgery had not been recommended for her hands, back, or neck, but that she recently started pain management for her back. She described her anxiety and depression: "Shortly after I ended up not working, then everything started crowding in on me. . . . [T]he phone will ring and it'll be a bill collector and I just crawl under a blanket and cover up my head and stay there." She stated that she cries "[t]wo or three times a day. . . . I don't need a reason." She also reported that she was taking Lexapro for her depression.

Regarding her activities of daily living, McGlothin testified that she lives alone and drives short distances two or three times per week. She stated that she visits a friend across the street and that her grown children visit her frequently at home. She stated that she brushes her own hair and dresses herself but does not wear shirts or jackets with buttons and does not tie her shoes. She stated that she goes grocery shopping only with help from relatives, cooks for herself "on a good day," and washes the dishes every two or three days. She stated that does not clean or wash clothes. She stated

3

that she could no longer engage in her hobbies, walk her dog, or check on her elderly neighbors "like [she] used to."

Regarding her functional limitations, McGlothin testified that she was most comfortable "changing positions" between sitting, standing, and walking, and that she could sit for about ten minutes and walk and stand for about fifteen minutes. She stated that she gets tired when climbing stairs. She estimated that she could lift "maybe five/ten" pounds. She last worked in August 2002 as a cashier.

A vocational expert, Charles Ryan, Ph.D., also testified at the hearing. Ryan testified that McGlothin's prior jobs as a dishwasher, cashier, laborer, and food preparer were classified as light exertion work. Given McGlothin's limitations, Ryan found that she could return to her positions as dishwasher and food preparer. He also testified that in the regional economy of Dayton, Cincinnati, and Springfield, Ohio, she could perform about 3,500 medium exertion jobs such as custodian, kitchen worker, and floral aid; and about 4,000 unskilled jobs requiring light exertion, such as X-ray inspector in the food processing industry, product inspector, lens matcher, house sitter, nut sorter, and table worker.

In addition to the testimony taken at the hearing, medical records from nine doctors who treated McGlothin or reviewed her medical record were admitted into evidence. The voluminous records are summarized below.

Dr. Thomas Goodall, a neurosurgeon, treated McGlothin intermittently since 1986 for cervical radiculopathy, brachial plexus lesion, carpal tunnel syndrome, and thoracic outlet syndrome due to an "industrial injury," presumably her 1985 accident. Goodall examined McGlothin on

4

September 20, 2002, and concluded that McGlothin had mild left and borderline right ulnar neuropathy at the elbow.

In a report of November 26, 2002, Goodall reported that an EMG revealed bilateral ulnar neuropathy but noted that on physical examination McGlothin did not appear to be compromised. He further noted her subjective complaints of pain in her back and both arms. In a letter to McGlothin's attorney of the same date, Goodall again noted McGlothin's subjective complaints of pain in her arms and "jumping." He concluded that McGlothin "remains temporarily and totally disabled." The following month, despite the fact that McGlothin's cardiologist had released McGlothin to work without restrictions, Goodall "extend[ed] her time off" due to McGlothin's complaints of "shakiness" and her statement that she was unable to work due to her shoulder, neck, and arm pain.

In 2003, Goodall ordered an MRI of the cervical spine in response to McGlothin's complaints of neck pain and tingling in her hands. The results were normal. In March 2004, Goodall concluded that McGlothin was limited to lifting five pounds, had a reduced capacity to reach, pull, and push, and should avoid overhead arm, neck, and shoulder activity.

Dr. Lazlo Posevitz, a cardiologist, began treating McGlothin in 1992 for her heart conditions and performed a number of bypass surgeries and angioplasties on her. Specifically, McGlothin had an exploration of bilateral axillary arteries and an axillo-axillo bypass using a 6 mm Gore-Tex graft on March 18, 1992; a table angiogram, balloon angioplasty, and a second axillo-axillo bypass on May 27, 1998; a right carotid endarterectomy with patch angioplasty on August 19, 1998; a table angiogram and a second balloon angioplasty on May 10, 2001; and a third angioplasty, also in 2001.

Posevitz saw McGlothin for an office visit on August 13, 2002, one day after she alleges she became disabled. McGlothin complained of numbness in her arm, and Posevitz did observe evidence of "reduced flow in the axillo-axillo bypass." He ordered a table angiogram, exploration with balloon angioplasty, and axillo-axillo bypass surgery. The surgery was successful and on September 13, 2002, Posevitz noted that McGlothin was "totally asymptomatic." Accordingly, he released her to work without restrictions as of September 18, 2002.

Dr. Willa Caldwell, a physician for the Ohio Bureau of Disability Determination ("BDD"), reviewed McGlothin's medical records in October 2002. She found that despite Posevitz's release to work without restrictions, McGlothin's condition did support some limitations. Specifically, Caldwell limited McGlothin to occasionally lifting fifty pounds; frequently lifting twenty-five pounds; and standing, walking, and sitting for a total of six hours each workday.

Dr. Deborah Southerland conducted a psychological evaluation of McGlothin on March 10, 2003, for the BDD. During the evaluation, McGlothin "visibly shook and trembled." Southerland diagnosed McGlothin with Dysthymic Disorder and Generalized Anxiety Disorder and awarded McGlothin a Global Assessment of Functioning score of 60 out of 100.[1]

Dr. Stephen T. Autry, an orthopedic surgeon, completed an independent medical examination of McGlothin on March 25, 2003. He observed that "[u]pon asking, [McGlothin] had limited

---

[1]The Global Assessment of Functioning reflects the clinician's evaluation of the patient's psychological, social, and occupational functioning. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). A score of 60 represents "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

mobility of the neck with only 10-15 degrees of lateral rotation . . . . However, when answering a question later in the examination with a negative answer she was able to turn her neck approximately 45 degrees in either direction without difficulty and was able to perform this maneuver repetitively." Autry concluded that McGlothin could not return to her previous job as a cashier but that she could perform "sedentary type employment with no overhead use of either extremity, limited repetitive activities with either upper extremity, no bending or stooping." He opined that she could perform "clerical type" work, but not work that involved "fine motor repetitive activities, such as an assembly line job."

Dr. Robert Gaffey, a psychologist, performed a record review for the BDD on March 31, 2003 and concluded that McGlothin's dysthymia and anxiety disorder limited her to "moderately complex" work without "strict time demands."

Dr. Gary Hinzman performed a record review on April 1, 2003, and concluded that McGlothin's condition was unchanged since the October 2002 record review. Therefore, Hinzman opined that McGlothin could perform medium exertion work.

Dr. Jeffrey S. Rogers, a pain management specialist, saw McGlothin on November 11, 2003, at Goodall's request. McGlothin reported "shaking attacks" and pain in her neck that radiated through both arms all the way to her fingers. He observed that McGlothin's "hands were very discolored and had a bluish purple hue to them. They were cold and clammy to the touch. The fingers on her right hand were significantly discolored from use of holding a cigarette." Rogers also noted that McGlothin had "a past history of significant alcohol abuse" and that McGlothin smoked a pack of cigarettes per day. He ordered trigger point injections to McGlothin's "upper trapezius

muscle groups" to address her upper neck pain.

Dr. James T. Lutz examined McGlothin on March 4, 2004, at her attorney's request. She complained to him of "nearly constant neck pain" resulting in "nearly daily headaches lasting from half a day to an entire day in length" and "nearly constant pain of the thoracic and lumbar areas," "aggravated with any significant head movement, any attempt at exertional activities, and with weather changes." He observed McGlothin to be "an emaciated female who appeared depressed and markedly older than her stated age. She arose from a seated position with mild difficulty and entered the examination room with a stiffened and ataxic gait." He noted that "[b]oth hands, wrists, and distal forearms were extremely cold, the coldest this examiner has ever encountered. There was mild puffiness of multiple fingers of both hands, with several healing open wounds." Lutz concluded that McGlothin could not perform any work activity, including sedentary work.

Based on this medical evidence and live testimony, the ALJ found that McGlothin was not disabled and denied her claim in a written decision dated July 27, 2004. The ALJ performed the five-step analysis. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determined that McGlothin had not performed substantial gainful activity after August 12, 2002. At step two, the ALJ found that McGlothin had the following severe impairments: dysthymia, anxiety, and "mild" left and "borderline" right carpal tunnel syndrome. The ALJ further found that McGlothin had the following nonsevere impairments: arterial vascular disease affecting the subclavian and axillary arteries and hypertension. At step three, the ALJ determined that McGlothin's severe impairments did not meet or equal any listed impairment. At step four, the ALJ found that McGlothin's residual functional capacity ("RFC") was limited to lifting up to fifty pounds occasionally and twenty-five pounds

frequently, and to "inside work in a temperature-controlled environment; low stress jobs, including no dealing with the public and no fast-paced work; and unskilled, simple tasks." Accordingly, the ALJ found that McGlothin could return to her past relevant work as a dishwasher and food preparer, jobs that require only light exertion. At step five, the burden shifted to the Commissioner to prove the existence of significant numbers of other jobs in the national economy that McGlothin could perform, given her RFC and age, education, and experience. The ALJ accepted the testimony of the vocational expert, Dr. Ryan, and found that the jobs he cited constituted a "significant number of jobs in the regional and national economies that the claimant can perform despite her impairments."

The Appeals Council denied McGlothin's request for review on January 9, 2006, and the opinion of the ALJ became the final decision of the Commissioner. McGlothin appealed the decision of the Commissioner to the United States District Court for the Southern District of Ohio. The matter was referred to United States Magistrate Judge Timothy S. Black, who issued a Report and Recommendation ("R&R") on August 24, 2007, finding that the Commissioner's decision was supported by substantial evidence. On September 28, 2007, the district court adopted the R&R and entered judgment affirming the decision of the Commissioner. McGlothin timely appealed.

II.

We review *de novo* the judgment of the district court in Social Security cases. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005). Accordingly, the Commissioner's determination that a claimant is not disabled may be disturbed only if it is not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Substantial evidence is "'more than a scintilla of evidence but less

than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). The Commissioner's decision is entitled to deference "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Accordingly, this court 'may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility.'" *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

A.

An individual is disabled within the meaning of the Social Security Act if he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. § 423(d)(2)(A). In applying the above standard, an ALJ must follow the five-step analysis set forth in 20 C.F.R. § 404.1520(a)(4) and summarized by this court as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe

before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529; *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543 (6th Cir. 2004);

*Buxton v. Halter*, 246 F.3d 762, 771-72 (6th Cir. 2001). The claimant bears the burden of proof at

steps one through four. *Jones*, 336 F.3d at 474; *Walters*, 127 F.3d at 529. The burden then shifts

to the Commissioner at step five to prove "a significant number of jobs in the economy that

accommodate the claimant's residual functional capacity (determined at step four) and vocational

profile." *Jones*, 336 F.3d at 474; *Walters*, 127 F.3d at 529.

B.

McGlothin first argues that the ALJ erred at step two by not finding that her impairments of

arterial vascular disease and hypertension were severe. The Commissioner responds that McGlothin

waived this argument by failing to raise it in the district court. Even if McGlothin has properly

preserved the issue, however, it is not dispositive. Step two is "'a de minimis hurdle'" that a

claimant clears unless the impairment is only "'a slight abnormality that minimally affects work

ability.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 1008) (quoting *Higgs v. Bowen*, 880

F.2d 860, 862 (6th Cir. 1988)). However, once any one impairment is found to be severe, the ALJ must consider both severe and nonsevere impairments in the subsequent steps. *Id.* Therefore, because the ALJ found that McGlothin has some severe impairments, he proceeded to complete steps three through five of the analysis. It then became "legally irrelevant" that her other impairments were determined to be not severe. *Id.*; *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Thus, McGlothin's claim that the ALJ erred is without merit.

C.

McGlothin next argues that the ALJ erred by disregarding the opinions of her treating physicians in concluding that her RFC allowed her to perform medium exertion work limited to lifting up to fifty pounds occasionally and twenty-five pounds frequently, and to inside work in a temperature-controlled environment; low stress jobs, including no dealing with the public and no fast-paced work; and unskilled, simple tasks. Under the treating physician rule, generally an ALJ must give greater deference to the opinions of treating physicians than to other sources, such as opinions of nonexamining physicians. 20 C.F.R. § 404.1527(d)(2); *Rogers*, 486 F.3d at 242; *Buxton*, 246 F.3d at 773. If the ALJ finds that the opinion of a treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record," then he must accord that opinion controlling weight. 20 C.F.R. § 404.1527(d)(2). If, however, there is conflicting evidence in the record, then the opinion of the treating source is not entitled to controlling weight and the ALJ must consider "a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician;

and any other relevant factors" in determining the weight to be accorded. *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d). In such a case, the ALJ is "not bound" by the treating source's opinion, *Jones*, 336 F.3d at 477, but he must give "'good reasons'" that are "'sufficiently specific'" for not giving it weight. *Wilson*, 378 F.3d at 544 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

In this case, the medical evidence in the record was conflicting and required the ALJ to determine the weight to be accorded each source. The ALJ found that Goodall did not provide sufficient objective evidence to support his opinion that McGlothin was limited to lifting five pounds. The only objective evidence cited was the EMG test results, which revealed mild left and borderline right carpal tunnel syndrome. Goodall's assessment appeared to the ALJ to be based almost entirely on McGlothin's subjective complaints, which the ALJ found to be incredible. Therefore, the ALJ did not accept Goodall's restriction.

The ALJ also rejected the opinion of Autry, finding that his examination was not reliable due to McGlothin's exaggeration of her symptoms. Accordingly, the ALJ did not accept Autry's conclusion that McGlothin was limited to sedentary work. Similarly the ALJ found that the opinion of Lutz was based almost entirely on McGlothin's subjective complaints, which the ALJ found to be "so severe that even a lay person could perceive them to be out of proportion with the minimal objective findings." The ALJ adequately articulated his reasons for rejecting the opinions of Goodall, Autry, and Lutz. The ALJ accepted the BDD doctors' findings that McGlothin could perform medium exertion work, as he found that this best reflected the minimal objective medical evidence in the record. As we have noted, "the Commissioner's decision cannot be overturned if

substantial evidence, or even a preponderance of the evidence, supports the claimant's position."

*Jones*, 336 F.3d at 477. All that is required is substantial evidence in the record to support the

Commissioner's position, and that deferential standard is met here.

D.

Finally, McGlothin argues that the ALJ erred by discrediting her own testimony. "Where the

uncontroverted medical evidence in the record is entirely consistent with a witness's testimony," an

ALJ may not discredit the testimony of that witness. *Anthony*, 266 F. App'x at 460 (emphasis

omitted). Where, however, the medical evidence is conflicting, an ALJ "must necessarily make

credibility determinations." *Id.* The ALJ's credibility determinations are entitled to great deference

because the ALJ had the "unique opportunity to observe" the witness's demeanor while testifying.

*Buxton*, 246 F.3d at 773; *Jones*, 336 F.3d at 476; *Walters*, 127 F.3d at 531. On appeal, a reviewing

court is "limited to evaluating whether or not the ALJ's explanations for [discrediting the witness]

are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

In this case, the evidence in the record was conflicting and required the ALJ to make

credibility determinations. Considering the evidence as a whole, the ALJ concluded that

McGlothin's allegations were not credible. He found that McGlothin's reported symptoms were "out

of proportion" with the objective medical evidence, particularly the MRI and EMG tests. He noted

that although McGlothin claimed to be suffering from disabling pain in her back, neck, arms, and

hands, she was never referred for surgery, physical therapy, or pain medication, with the exception

of the pain management specialist whom she first saw three days before the administrative hearing.

Additionally, the ALJ found that McGlothin's allegations were inconsistent with her "quite

14

significant" daily activities, which included taking care of her dogs, cooking, washing the dishes, driving, and checking in on her elderly neighbors. The ALJ observed a pattern of "alleging increasing severity of her symptoms and expanding the number of her impairments to the point that she is simply not credible." Because the ALJ provided specific explanations for his credibility finding, and because his finding was within the zone of reasonable choices, his denial of McGlothin's application for benefits must be affirmed. *See Buxton*, 246 F.3d at 773.

III.

For the foregoing reasons, we affirm the judgment of the district court.